United States District Court
Northern District of California

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

VINCENT KEITH BELL,

Plaintiff,

v.

SGT. YVETTE WILLIAMS, *et al.*,

Defendants.

Case No. 18-cv-01245-SI

**ORDER GRANTING IN PART AND DENYING IN PART DEFENDANTS' MOTION FOR SUMMARY JUDGMENT AND DENYING PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT**

Re: Dkt. Nos. 108, 111

On October 22, 2021, the Court held a hearing on plaintiff's motion for partial summary judgment and defendants' motion for summary judgment. For the reasons set forth below, defendants' motion is GRANTED IN PART and DENIED IN PART, and plaintiff's motion is DENIED.

**BACKGROUND**

Plaintiff Vincent Keith Bell is a longtime pretrial detainee at San Francisco County Jail. He has been detained since 2012 when he was arrested for murder and other felonies. Bell's right leg is amputated above the knee, and he uses a wheelchair or a prosthetic device for mobility. At the time of the events giving rise to this lawsuit, Bell was housed in administrative segregation in a single occupancy cell, Isolation Cell #3 ("Iso. 3"), in San Francisco County Jail #2 ("CJ#2"), also known as "C-Pod." C-Pod houses inmates with medical or mental health needs.

Bell alleges that on the morning of January 14, 2018, he asked Deputy Leung for a razor to shave, and that in response Leung asked Bell what Bell could do for him and to show him "it,"

referring to Bell's penis. Bell told Leung he would file a grievance over the alleged sexual harassment. Later that day, Deputy Leung issued a Request for Discipline ("RFD") against Bell for being disruptive and refusing a direct order. Kim Decl. Ex. G (Dkt. No. 121-9). The RFD states that around 11:30 am on January 14, Leung heard Bell yelling and cheering loudly about a football game. Leung asked Bell to lower his voice, and Bell refused to do so and said "Shut the fuck up. I'm watching the game." *Id*. Sergeant Williams reviewed Leung's RFD. Her report states that when she spoke to Bell about the RFD, he denied saying "Shut the fuck up," that other people were cheering but Leung singled him out, and that Bell asked Williams to "waive this RFD until you hear my grievance." *Id*. Bell claims that the grievance to which he referred was the grievance that he later filed against Leung for sexual harassment. The record contains a grievance dated January 17, 2018, in which Bell claimed that Leung had sexually harassed him by asking to see his penis on January 14. Wang Decl., Ex. U (Dkt. No. 111-23).

Sergeant Williams sustained the RFD and concluded that Bell had committed three disciplinary violations (direct order, gestures/language, and general order) for which she imposed the following discipline: restricted housing for 10 days, loss of commissary for 10 days, and loss of visits for 10 days. *Id*. Bell asserts that according to the Inmate Code of Conduct, Kim Decl., Ex. U (Dkt. No. 121-23), the three violations for which he was written up should have resulted in at most 2 days loss of commissary and 3-4 days of loss of visits, and that Williams aggravated the discipline. At her deposition, Williams testified that she aggravated the discipline because Bell continued to show disrespect towards deputized staff. Kim Decl., Ex. B (Williams Depo. at 75-76, Dkt. No. 121-4). Bell also asserts that because he was already in restricted housing (administrative segregation) and confined to isolation for 24 hours a day except visits and court appointments, the punishment of 10 days of restricted housing should not have added anything to what was already in place.

On the morning of January 18, 2018, Sergeant Williams was the Acting Watch Commander of C-Pod. Kim Decl., Ex. I (Dkt. No. 121-11). According to Sergeant Williams' Incident Report, as she was conducting her morning rounds, she instructed Deputy Segundo to give Bell two large plastic bags and instruct Bell to pack up his property in order to move next door to Isolation Cell #2 ("Iso. 2"). *Id*. Bell asserts that Iso. 2 and Iso. 3 are identical and that both are "restricted housing."

Sergeant Williams' Incident Report states that after Bell was told he needed to move to Iso. 2,

> Bell began yelling from his cell and asked why he was moving. I told Bell that he was given a direct order to pack his property and move. Bell began yelling from his cell, "I'm not moving anywhere Sergeant Williams, you're going to have to move me!" I again asked Bell to stop yelling from his cell and requested he roll up his property. Bell yelled, "You're going to have to come and get me. Go get your little team Sergeant Williams! I'm going to get my money's worth!" Bell began moving his hospital bed in a position in front of his cell door. Bell then placed his mattress upright against his cell door to impede anyone from entering his cell. Bell then moved his property, which was about 2 large plastic bags of paper weighing approximately 30 lbs., against his cell door. Bell then placed a large plastic bag over himself. Bell said he was preparing for pepper spray and taser. Bell continued to yell, "Come on! Come and get me!" I instructed Deputy Edwards #1355 to talk to Bell in an attempt to have Bell comply and de-escalate the situation. Deputy Edwards talked to Bell for about 5 minutes. Bell told Edwards, "I'm not moving. I want Leung to be the first to enter my cell!" Deputy Leung wrote the original RFD that was adjudicated which ended up Restricted Housing.

Kim Decl., Ex. I (Dkt. No. 121-11). At his deposition, Bell testified that although he initially did not comply with Williams' order, he told Sergeant Williams that he would comply and pack up his belongings, but that he first wanted to speak to Lieutenant DeGuzman. Bell Depo. at 179 (Dkt. No. 121-3).

Sergeant Williams then instructed nine deputies to meet her at a different location in the jail to prepare a S.O.R.T. team to forcibly extract Bell from his cell. While the S.O.R.T. team was preparing, Bell spoke to Lieutenant DeGuzman in his cell. Bell testified at his deposition that he did not understand why he was being required to move to Iso. 2 since he was already in restricted housing. Bell also testified that after DeGuzman told him that he would be able to move back to Iso. 3 after 10 days, he packed up all of his belongings and sat in his wheelchair.

What happened next is captured on video taken by the S.O.R.T. team. The video starts at approximately 9:56 a.m. on January 18. Sergeant Williams and the S.O.R.T. team are standing outside the door to C-Pod, and Sergeant Williams states that the S.O.R.T. team is assembled to perform a cell extraction of Bell because he has barricaded himself with a medical bag and mattress in his cell, that Bell has placed a plastic bag over himself to "thwart the use of pepper spray and the taser," and that Bell is refusing to rehouse. Sergeant Williams also stated that Bell is "wheelchair bound but very capable of fighting deputized staff," and that Bell will be going to a safety cell "for danger to others, which he has clearly stated he will not be moving, refuses to comply." The

United States District Court
Northern District of California

S.O.R.T. team was outfitted in full protective gear, including helmets, face shields, chest plates, and arm and leg coverings. Deputy Bryan was equipped with an Arwen, an anti-riot weapon, and Deputy Yeung had a taser.

The S.O.R.T. team then entered C-Pod. When the team arrived at Bell's cell, Bell was sitting in his wheelchair and he was not wearing a plastic bag. Bell's belongings were not barricading the door, and instead were on top of his bed. As soon as Bell saw the deputies, he put his hands over his head. After the S.O.R.T. team entered Bell's cell, Sergeant Williams ordered Bell to get on the ground, face-down. Bell did so. Sergeant Williams yelled, "Bell do not resist," and Bell replied, "I am not resisting." As Bell lay on the ground, deputies handcuffed his hands behind his back. The deputies stood Bell up, and Bell was forced to hop on one leg from Iso. 3 to a safety cell approximately 64 feet away with deputies on either side of him holding onto his arms. During the transport, Bell complained that his leg was tired and that he was in pain, and at one point he fell to the ground and said he could not hop anymore. Deputies then carried him, face-down, by his handcuffed arms and one leg into the safety cell, where he was stripped naked. Bell claims that he suffered physical pain as a result of the extraction, including pain in his wrists, shoulders, back, ankle and knee.

Sergeant Williams testified at her deposition that at some point she made the decision to transport Bell to the safety cell without the use of a wheelchair, gurney or prosthetic device. Williams testified that she was not sure exactly when she made that decision, and that she made that decision because Bell had a history of hiding contraband in his wheelchair and because he had barricaded himself in his cell and she didn't want to take a chance that he had hidden something in his wheelchair. Kim Decl. Ex. B (Williams Depo. at 184, Dkt. No. 121-4). Williams also testified, "I also have seen him fully capable on his one leg and he is extremely strong, so I didn't see the reason – he had – he was sitting there calmly, and I thought he can walk on his one leg. He is very capable." *Id.* Bell states in his declaration that because C-Pod is a medical unit, "[t]here are wheelchairs, gurneys, restraint chairs, crutches, canes, and walkers in C-Pod." Bell Decl. ¶ 3 (Dkt. No. 121-27). Bell states that these devices are stored in C-Pod, "and in fact right outside of Isolation Cell 3. Some of these items are stored along the center stairwell and are visible." *Id.* Bell claims

United States District Court
Northern District of California

that on January 18, there were at least three wheelchairs available, two outside of his cell and one inside the cell. *Id.* ¶ 5.

Bell stayed in the safety cell for 20 hours. The safety cell is a padded cell that does not contain a bed or a toilet; there is a grate on the ground that inmates use for urination and defecation. While in the safety cell, Bell requested the use of his prosthetic when he had to use the bathroom, but that request was denied. Bell testified that he had to "hold it" instead of defecating because otherwise he would have been required to sit on a grate in the floor that was covered with urine and feces. Bell Depo. at 169-170 (Dkt. No. 121-3).

On January 20, 2018, Bell filed a grievance about the use of the S.O.R.T. team and placement in the safety cell. Bell stated that he was complying with the order to move to a different cell and that the use of the S.O.R.T. team to forcibly extract him from his cell was done in retaliation for his January 17 grievance against Leung for sexual harassment. Kim Decl., Ex. V (Dkt. No. 111-24). Bell also complained that he was forced to hop on one leg until his leg gave out and that deputies carried him by his three limbs. *Id.* The January 20 grievance also complained that Leung's RFD that resulted in discipline did not list safety cell placement, and that the safety cell placement was "fraudulent." *Id.*

The fifth amended complaint asserts the following causes of action: (1) 42 U.S.C. § 1983, Fourteenth Amendment Excessive Force challenging the S.O.R.T. team's forcible extraction of Bell from his cell, against defendants Sergeant Williams, Bryant, Bui, Daly, DeJesus, Leung, Walsh, and Yeung (the S.O.R.T. team); (2) 42 U.S.C. § 1983, Fourteenth Amendment Violation of Due Process challenging the placement in the safety cell as punishment, against defendants Captain Fisher, Sergeant Williams, and the S.O.R.T. team members; (3) 42 U.S.C. § 1983, *Monell* liability and supervisory liability against defendants City and County of San Francisco, Captain Fisher and Sergeant Williams; (4) Violation of Title II of the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12131, against the City and County of San Francisco for disability discrimination; (5) Violation of Section 504 of the Rehabilitation Act of 1973 ("Rehabilitation Act"), 29 U.S.C. § 701, against the City and County of San Francisco for disability discrimination; and (6) 42 U.S.C. § 1983, First Amendment Retaliation against defendants Captain Fisher, Sergeant Williams, and Deputy

Leung.

Now before the Court are the parties' cross-motions for summary judgment.  Plaintiff moves for summary judgment on the fourth and fifth causes of action under the ADA and the Rehabilitation Act, and defendants move for summary judgment on all causes of action.

**LEGAL STANDARD**

Summary judgment is proper if "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  The moving party bears the initial burden of demonstrating the absence of a genuine issue of material fact.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).  The moving party, however, has no burden to disprove matters on which the non-moving party will have the burden of proof at trial.  The moving party need only demonstrate to the Court that there is an absence of evidence to support the non-moving party's case.  *Id*. at 325.

Once the moving party has met its burden, the burden shifts to the non-moving party to "set out 'specific facts showing a genuine issue for trial.'"  *Id*. at 324 (quoting then-Fed. R. Civ. P. 56(e)).  To carry this burden, the non-moving party must "do more than simply show that there is some metaphysical doubt as to the material facts."  *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp*., 475 U.S. 574, 586 (1986).  "The mere existence of a scintilla of evidence . . . will be insufficient; there must be evidence on which the jury could reasonably find for the [non-moving party]."  *Anderson v. Liberty Lobby, Inc*., 477 U.S. 242, 252 (1986).

In deciding a summary judgment motion, the court must view the evidence in the light most favorable to the non-moving party and draw all justifiable inferences in its favor.  *Id*. at 255.  "Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge . . . ruling on a motion for summary judgment."  *Id*.  However, conclusory, speculative testimony in affidavits and moving papers is insufficient to raise genuine issues of fact and defeat summary judgment.  *Thornhill Publ'g Co., Inc. v. GTE Corp*., 594 F.2d 730, 738 (9th Cir. 1979).  The evidence the parties present must be admissible.  Fed. R. Civ. P. 56(c).

**DISCUSSION**

**I.     Fourteenth Amendment Excessive Force Claim Against Sergeant Williams and the S.O.R.T. Team (First Cause of Action)**

Plaintiff frames this claim as "the use of the SORT to extract Bell from his cell amounted to unjustified punishment unrelated to legitimate penological goals."  Plaintiff argues that it was excessive to use the S.O.R.T. team to forcibly extract him from his cell when he was compliant and was not a danger to himself or others, and that the manner in which he was extracted – without the use of a wheelchair or other assistive device, resulting in officers carrying him by his limbs with his arms handcuffed behind his back – was excessive.

The Due Process Clause of the Fourteenth Amendment protects a post-arraignment pretrial detainee from the use of excessive force that amounts to punishment.  *Graham v. Connor*, 490 U.S. 386, 395 n.10 (1989) (citing *Bell v. Wolfish*, 441 U.S. 520, 535-39 (1979)).  To prove an excessive force claim under § 1983, a pretrial detainee must show that the "force purposely or knowingly used against him was objectively unreasonable."  *Kingsley v. Hendrickson*, 576 U.S. 389, 397 (2015). "A court must make this determination from the perspective of a reasonable officer on the scene, including what the officer knew at the time, not with the 20/20 vision of hindsight."  *Id.*  "A court (judge or jury) cannot apply this standard mechanically."  *Id.*   "[O]bjective reasonableness turns on the 'facts and circumstances of each particular case.'"  *Id.* (quoting *Graham*, 490 U.S. at 396); *accord Lombardo v. City of St. Louis*, 141 S. Ct. 2239, 2241-42 (2021) (per se rule that use of prone restraint is constitutional so long as individual appears to resist officers' efforts to subdue him would be improper because it would "contravene the careful, context-specific analysis required" in excessive force cases).

A non-exhaustive list of considerations that may bear on the reasonableness of the force used include "the relationship between the need for the use of force and the amount of force used; the extent of the plaintiff's injury; any effort made by the officer to temper or to limit the amount of force; the severity of the security problem at issue; the threat reasonably perceived by the officer; and whether the plaintiff was actively resisting."  *Kingsley*, 576 U.S. at 397.  Because the *Kingsley*

standard applicable to excessive force claims by pretrial detainees is purely objective, a plaintiff need not prove whether the defendant understood that the force used was excessive or intended it to be excessive. *Castro v. Cty. of Los Angeles*, 833 F.3d 1060, 1069 (9th Cir. 2016) (en banc). A pretrial detainee can prevail by providing "'objective evidence that the challenged governmental action is not rationally related to a legitimate governmental objective or that it is excessive in relation to that purpose.'" *Id.* (quoting *Kingsley*, 576 U.S. at 397-98)) (emphasis in original).

The Court concludes that there are questions of fact as to whether the use of the S.O.R.T. team under these circumstances was excessive. Bell claims that he was not a danger to himself or others. Critically, it is disputed whether Bell told Sergeant Williams that he would comply and move cells prior to the cell extraction. The beginning of the cell extraction video shows Bell sitting in his wheelchair, not wearing any plastic, compliant and with his hands raised, and with his belongings on the bed. Nothing is barricading the door. It is undisputed that Sergeant Williams made the decision that Bell would be forcibly extracted from his cell without the use of a wheelchair or other assistive device, and there are disputes about whether a wheelchair or other device could have been provided. Reasonable minds can differ about whether, under those circumstances, it was excessive to use a nine-member S.O.R.T. team, outfitted with an Arwen and a taser, to forcibly extract Bell from his cell without the use of a wheelchair or assistive device, and requiring him to hop on one leg and then be carried by his limbs while handcuffed behind his back. Thus, the Court concludes that there are questions of fact regarding Sergeant Williams' decision to use the S.O.R.T. team and that level of force to extract Bell from his cell, and DENIES summary judgment as to Sergeant Williams.

The Court also concludes that the resolution of whether Sergeant Williams is entitled to qualified immunity requires determination of factual disputes, including whether Bell told Williams he would comply, whether Bell was danger to others, and whether Bell could have been transported in a wheelchair. *See Saucier v. Katz*, 533 U.S. 194, 201 (2001) ("A court required to rule upon the qualified immunity issue must consider . . . this threshold question: Taken in the light most favorable to the party asserting the injury, do the facts alleged show the officer's conduct violated a constitutional right? This must be the initial inquiry."). A jury is well-suited to resolve the factual

8

allegations relating to plaintiff's claims.  *See Ruiz v. Sawaya*, No. 11-CV-03126-JST (PR), 2013 WL 5665404, at *4 (N.D. Cal. Oct. 15, 2013) ("[E]valuation of plaintiff's excessive force claim depends principally on credibility determinations and the drawing of factual inferences from circumstantial evidence, both of which are the traditional functions of the jury".).  Accordingly, factual disputes preclude a finding of qualified immunity.  *See Wilkins v. City of Oakland*, 350 F.3d 949, 951 (9th Cir. 2003) ("appellate review is generally limited to issues of law . . . and 'does not extend to claims in which the determination of qualified immunity depends on disputed issues of material fact.'") (internal citation omitted); *Loyce Amos Moore & Cleo Davis Moore v. City and County of San Francisco*, 9th Cir. Case No. 20-17494, D.C. No. 3:18-cv-634-SI (9th Cir. Mar. 11, 2021) (denying motion to stay district court proceedings pending appeal where district court denied summary judgment and qualified immunity based on issues of fact).

However, the Court concludes that the other members of the S.O.R.T. are entitled to qualified immunity.  "Qualified immunity attaches when an official's conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *White v. Pauly*, 137 S. Ct. 548, 551 (2017) (per curiam) (internal quotation marks omitted). A right is clearly established when it is "sufficiently clear that every reasonable official would have understood that what he is doing violates that right." *Mullenix v. Luna*, 577 U.S. 7, 11 (2015) (per curiam) (internal quotation marks omitted).

Here, the S.O.R.T. team members were acting under Sergeant Williams' direction.  The cell extraction video shows Sergeant Williams stating – to the camera and the S.O.R.T. team members – that Bell was a danger to others and refusing to comply.  Sergeant Williams made the decision to transport Bell without the use of a wheelchair and thus the S.O.R.T. team members were carrying out her instructions regarding the manner of the cell extraction.  Under these circumstances, a reasonable officer would not have understood that in carrying out the S.O.R.T. extraction he or she was potentially violating Bell's rights to be free of excessive force.

///

United States District Court
Northern District of California

United States District Court
Northern District of California

## II.      Fourteenth Amendment Due Process Claim Against Individual Defendants re: Safety Cell Placement as Punishment (Second Cause of Action)

Plaintiff alleges that he was placed in the safety cell as punishment in violation of his Due Process rights.  "[T]he placement of pretrial detainees in safety cells is 'punishment' in violation of the Fourteenth Amendment only if prison officials act with deliberate indifference to the inmates' needs."  *Anderson v. Cty. of Kern*, 45 F.3d 1310, 1313 (9th Cir.), opinion amended on denial of reh'g, 75 F.3d 448 (9th Cir. 1995).  "The test for whether a prison official acts with deliberate indifference is a subjective one: the official must 'know[ ] of and disregard[ ] an excessive risk to inmate health and safety; the official must both be aware of the facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference.'"  *Id.* (quoting *Farmer v. Brennan*, 511 U.S. 825, 837 (1994)).

For reasons similar to those discussed above with regard to the excessive force claim, the Court DENIES summary judgment on Bell's claim against Sergeant Williams and GRANTS summary judgment in favor of the other defendants.  Bell has raised questions of material fact as to whether Sergeant Williams' decision to place Bell in the safety cell was based on legitimate penological reasons or whether it was punitive.  Sergeant Williams determined that Mr. Bell was a "danger to others" after he allegedly refused to comply with her order to move cells.  However, Bell claims that he told Sergeant Williams he would move cells, and the video shows that Bell was compliant and not physically combative.

However, it is undisputed that it was Sergeant Williams who made the decision to place Bell in the safety cell, and that the S.O.R.T. team members were only carrying out that decision.  As to Captain Fisher, Bell has not raised a triable issue of fact as to whether Fisher had any reason to believe that Bell was not a danger to others – as Williams stated he was – and thus Fisher is entitled to summary judgment.

## III.      First Amendment Retaliation Against Deputy Leung, Sergeant Williams and Captain Fisher (Sixth Cause of Action)

Within the prison context, a viable claim of First Amendment retaliation contains five elements: "(1) An assertion that a state actor took some adverse action against an inmate (2) because

1    of (3) that prisoner's protected conduct, and that such action (4) chilled the inmate's exercise of his

2    First Amendment rights, and (5) the action did not reasonably advance a legitimate correctional

3    goal." *Rhodes v. Robinson*, 408 F.3d 559, 567-68 (9th Cir. 2005) (footnote omitted).

4

5    ### A.   Deputy Leung

6            Plaintiff alleges that when Deputy Leung sexually harassed him on the morning of January

7    14, 2018, he told Leung that he would be filing a grievance, and that Leung then retaliated against

8    him by issuing the January 14, 2018 RFD.  Defendants contend that plaintiff never filed a grievance

9    alleging Deputy Leung's RFD was retaliation for complaining about sexual harassment, and

10   therefore that plaintiff did not exhaust his administrative remedies as required by the Prison

11   Litigation Reform Act.

12           The Prison Litigation Reform Act of 1995, Pub. L. No. 104-134, 110 Stat. 1321 (1996)

13   ("PLRA"), amended 42 U.S.C. § 1997e to provide that "[n]o action shall be brought with respect to

14   prison conditions under [42 U.S.C. § 1983], or any other Federal law, by a prisoner confined in any

15   jail, prison, or other correctional facility until such administrative remedies as are available are

16   exhausted." 42 U.S.C. § 1997e(a).  Exhaustion is mandatory and no longer left to the discretion of

17   the district court.  *Woodford v. Ngo*, 548 U.S. 81, 84 (2006) (citing *Booth v. Churner*, 532 U.S. 731,

18   739 (2001)).

19           Bell contends that he exhausted his retaliation claim against Deputy Leung, citing a January

20   20, 2018 grievance.  *See* Pl's Opp'n at 18, citing Kim Decl. Ex. F (grievance Bates-stamped CCSF-

21   VBELL_000077) (Dkt. No. 121-8).  In that grievance, Bell complained about the January 18 cell

22   extraction and being forced to hop on one leg and being carried by deputies to the safety cell.  Bell

23   also complained that the extraction and placement in the safety cell "torture and torment was to

24   intimidate and threaten Bell to not get a response or push his grievance on Deputy Leung for sexual

25   harassment on 1-17-18."[1]  *Id.*  Plaintiff also complained that Deputy Leung's January 14, 2018 RFD

26

27           [1]   In the January 17, 2018 grievance, plaintiff complained that Deputy Leung sexually
     harassed him on January 14, 2018 by asking to see his penis.  Wang Decl., Ex. U (Dkt. No. 111-
28   23).  The January 17 grievance does not allege that Deputy Leung retaliated against plaintiff by
     issuing the January 14 RFD.

     United States District Court
     Northern District of California

"does not have safety cell placement on it!" *Id.*

The Court concludes that Bell did not exhaust his retaliation claim because the January 20, 2018 grievance did not allege that Deputy Leung's January 14, 2018 RFD was retaliation for complaining about Leung's alleged sexual harassment. The January 20 grievance only mentions Leung's January 14 RFD in the context of complaining that the safety cell placement was not warranted by the RFD. In addition, although the January 20 grievance refers to the January 17 grievance, that reference does not encompass the retaliation claim because the January 17 grievance only addressed Leung's alleged sexual harassment and not the January 14 RFD. Accordingly, the Court GRANTS defendants' motion for summary judgment on Bell's retaliation claim against Deputy Leung.

### B.    Sergeant Williams

Plaintiff alleges that Sergeant Williams retaliated against him for filing the sexual harassment grievance against Leung when she imposed and carried out the discipline against Bell. The Court DENIES defendants' motion for summary judgment on this claim, as there are questions of fact about whether Sergeant Williams knew about Bell's grievance when she made the allegedly retaliatory decisions, as well as questions of fact about Sergeant Williams' motivations and whether her decisions were justified by Bell's actions and/or in compliance with the S.O.R.T. and safety cell policies.

### C.    Captain Fisher

Plaintiff alleges that Captain Fisher retaliated against him for filing the sexual harassment grievance against Leung by approving the disciplinary action against Bell and failing to meaningfully investigate the grievance against Leung. The Court GRANTS defendants' motion for summary judgment on plaintiff's retaliation claim against Fisher. Here, the evidence shows that Sergeant Williams made the decisions about what discipline to impose (including aggravating the discipline), as well as the decisions about using the S.O.R.T. team and the safety cell placement. Plaintiff emphasizes the fact that Captain Fisher approved Williams' decisions to use the S.O.R.T.

team and the safety cell placement.  However, plaintiff has not cited to any evidence suggesting a retaliatory motive on Fisher's part.  As such, plaintiff has not raised a triable issue of fact as to whether Fisher took any actions "because of" Bell's grievance.  *See Manzanillo v. Moulton*, No. 13-CV-02174-JST (PR), 2014 WL 4793780, at *10 (N.D. Cal. Sept. 25, 2014) (granting summary judgment on retaliation claim because no evidence of retaliatory animus where "[t]he undisputed evidence shows that the decision to move plaintiff to the PSU was not made by Moulton at all, but rather by [other individuals].")

### IV.    *Monell* Liability (Third Cause of Action)

The third cause of action alleges that the County is liable under *Monell v. Department of Social Services*, 436 U.S. 658 (1978), because (1) there is a pattern and practice of misusing the safety cell for punishment and retaliatory reasons rather than their intended use; (2) the County has failed to train its deputized staff on the proper use of the S.O.R.T. and the safety cell; and (3) defendants Williams and Fisher are final policymakers who violated plaintiff's rights.[2]

### A.    Pattern and Practice

Plaintiff has submitted evidence in support of a pattern and practice of misusing the safety cell for punishment and retaliatory reasons through his own testimony regarding prior allegedly improper placements in the safety cell, the declarations of four other pretrial detainees[3] who claim that they were placed in the safety cell for punishment or for retaliatory reasons, and newspaper articles.

---

[2] The third cause of action also alleges claims for supervisory liability against Captain Fisher and Sergeant Williams. *See, e.g.*, *Starr v. Baca*, 652 F.3d 1202, 1206-07 (9th Cir. 2011) (discussing supervisory liability under § 1983). Defendants did not move for summary judgment on those claims.

[3] Defendants object that plaintiff did not disclose the facts set forth in the inmates' declarations.  However, the interrogatory responses filed by defendants show that plaintiff disclosed these individuals in response to Interrogatory Number 14, which asked for "ALL evidence, including ALL DOCUMENTS AND PERSONS, that support YOUR contention that the CITY has a pattern and practice of misusing and authorizing the misuses of safety cells for disciplinary and retaliatory reasons." Dkt. No. 124-5. The Court does not consider the newspaper articles submitted by plaintiff, as defendants are correct that those articles are hearsay.

United States District Court
Northern District of California

"A section 1983 plaintiff may attempt to prove the existence of a custom or informal policy with evidence of repeated constitutional violations for which the errant municipal officials were not discharged or reprimanded." *Gillette v. Delmore*, 979 F.2d 1342, 1349 (9th Cir. 1992). "The custom must be so 'persistent and widespread' that it constitutes a 'permanent and well settled city policy.'" *Trevino v. Gates*, 99 F.3d 911, 918 (9th Cir. 1996) (quoting *Monell*, 436 U.S. at 691). "Liability for improper custom may not be predicated on isolated or sporadic incidents; it must be founded upon practices of sufficient duration, frequency and consistency that the conduct has become a traditional method of carrying out policy." *Trevino*, 99 F.3d at 918; *see also Nadell v. Las Vegas Metropolitan Police Dep't*, 268 F.3d 924, 930 (9th Cir. 2001) (reversing jury verdict on *Monell* claim where "[t]here was no evidence introduced at trial to establish that the use of excessive force was a formal policy or widespread practice of the LVMPD or that previous constitutional violations had occurred for which the offending officers were not discharged or reprimanded."); *compare Nehad v. Browder*, 929 F.3d 1125, 1141-42 (9th Cir. 2019) (reversing summary judgment and finding triable issues of fact on *Monell* claim where plaintiff had submitted evidence that 75% of police department shootings were avoidable; the shooting at issue was approved by the department; and the department looked the other way when lethal force was used).

The Court concludes that plaintiff has failed to raise a triable issue of fact as to a pattern and practice of using safety cells for disciplinary and/or retaliatory reasons. As an initial matter, the Court agrees with defendants that the newspaper articles are hearsay. *See AFMS LLC v. United Parcel Serv. Co.*, 105 F. Supp. 3d 1061, 1070 (C.D. Cal. 2015) ("It is axiomatic to state that newspaper articles are by their very nature hearsay evidence and are thus inadmissible if offered to prove the truth of the matter asserted[.]").

Second, plaintiff has provided scant information about his prior six experiences of being placed in the safety cell. Plaintiff's declaration does not address these incidents, and at his deposition he testified that he had been placed in the safety cell "never for the correct reasons." Bell Depo. at 208-09 (Dkt. No. 121-3). Bell also testified that he had seen numerous other detainees be placed in the safety cell for improper reasons; however, that testimony is conclusory and not evidence of a custom.

Third, the declarations do not establish the existence of a custom or informal policy of improperly using the safety cell for disciplinary or retaliatory reasons. The four declarations submitted by plaintiff describe very different factual scenarios from this case and from each other. For example, Mr. Barrow states that he was placed in a safety cell in May 2017 after a fight broke out between three inmates when he was in the "12-man tank." Barrow Decl. ¶ 2 (Dkt. No. 121-28). He states that he was not involved in the fight but that he was placed in the safety cell "for being a danger to others," and he concludes that he was placed in the safety cell "for punishment." *Id*. ¶¶ 3, 5, 8. Mr. Evans states that he was placed in the safety cell in December 2020 as retaliation for talking to a sergeant about his phone privileges and that a deputy falsely claimed that he was suicidal. Evans Decl. ¶¶ 4-6 (Dkt. No. 121-31). Mr. Evans states that he was improperly placed in a safety cell in April 2021 after he was cleaning his cell with a rag and the rag got caught in the sprinkler, and that he was later told by a psych nurse that he was placed in the safe cell because he was a danger to himself. *Id.* ¶ 9; *see also* DeCuir Decl. (Dkt. No. 121-30) (stating she was placed in the safety cell in September 2018 after she was told she was getting a new cellmate and joked that she "would rather be in the safety cell than housed with the new cell mate"); Brewster Decl. (Dkt. No. 121-29) (describing two safety cell placements, one after he complained of not being able to breathe and one allegedly in retaliation for filing a grievance). Further, plaintiff has not submitted any evidence showing that any of the declarants' safety cell placements have been admitted or determined to be improper.[4] Under these circumstances, the declarations are insufficient to raise a triable issue of fact on the existence of a custom or policy. *See Manzo v. Cty. of Santa Clara*, No. 17-CV-01099-BLF, 2020 WL 6940935, at *15 (N.D. Cal. Nov. 25, 2020) (granting summary judgment on *Monell* claim where plaintiff's evidence of custom consisted of other claims of

---

[4] Defendants have submitted a request for judicial notice of a lawsuit filed by Mr. Barrows; that lawsuit does not allege that his placement in a safety cell violated his constitutional rights. Dkt. No. 125-1. Defendants have also submitted a request for judicial notice of a lawsuit filed by Mr. Brewster. Dkt. No. 125-2. That lawsuit alleges that a safety cell placement was retaliatory and for disciplinary reasons. Defendants note that in Mr. Brewster's case, Judge Gilliam notified that parties that he intended to grant the defendants' motion for summary judgment "in substantial part." *See* Case No. 20-cv-03254-HSG, Dkt. No. 98. As of November 19, a written order had not yet been issued in that case.

excessive conduct, none of which resulted in a finding or admission of fault); *Alegrett v. City and County of San Francisco*, No. 12-CV-05538-MEJ, 2014 WL 1911405, at *6 & n.5 (N.D. Cal. May 13, 2014) (granting summary judgment on *Monell* claim and finding, *inter alia*, that plaintiff's evidence of "four factually dissimilar civil rights actions" filed by plaintiff's counsel over a three year period, none of which resulted in a finding of liability, was insufficient to raise a triable issue of fact as to the existence of a custom).

Accordingly, the Court GRANTS summary judgment in favor of defendants on Bell's pattern and practice theory of *Monell* liability.

### B.     Failure to Train

Bell alleges that CCSF failed to train its deputized staff on the proper use of the S.O.R.T. and the safety cell.  Defendants contend that they are entitled to summary judgment because they have submitted evidence showing that the deputies and Sergeant Williams received training on S.O.R.T. cell extractions and safety cell use during their "CORE" training, and that Sergeant Williams received additional training on S.O.R.T. and the safety cell when she became a supervisor. See Dkt. Nos. 111-12.

Plaintiff's opposition argues that the training is deficient because CCSF does not retrain deputies after their initial training (and notes that Sergeant Williams was last trained in 2006), nor does CCSF provide any training regarding the S.O.R.T. cell extraction or safety cell placement of prisoners with disabilities. *See, e.g.*, Malabed Depo. at 62.  Plaintiff also notes that neither the S.O.R.T. nor safety cell policies specifically address inmates with disabilities.  Plaintiff argues that CCSF has had actual and constructive notice that the ADA applies to all law enforcement facilities and that deputized staff must comply with it.  *See*, *e.g.*, Kim Decl. Ex. D (State of California Commission on Peace Officer Standards and Training Learning Domain 37 People with Disabilities Basic Course Workbook Series, stating *inter alia* that ADA applies to local detention facilities and agencies must provide accommodations and transport disabled individuals who require special equipment) (Dkt. No. 108-6).  Finally, Bell asserts that the deputies and Sergeant Williams violated the S.O.R.T. and safety cell policies in a variety of ways that contributed to the alleged constitutional

violations, and that those violations were the result of CCSF's failure to train.

"A municipality's failure to train an employee who has caused a constitutional violation can be the basis for § 1983 liability where the failure to train amounts to deliberate indifference to the rights of persons with whom the employee comes into contact." *Long v. Cty. of Los Angeles*, 442 F.3d 1178, 1186 (9th Cir. 2006). "A 'pattern of similar constitutional violations by untrained employees is ordinarily necessary to demonstrate deliberate indifference for purposes of failure to train,' though there exists a 'narrow range of circumstances [in which] a pattern of similar violations might not be necessary to show deliberate indifference.'" *Flores v. Cty. of Los Angeles*, 758 F.3d 1154, 1159 (9th Cir. 2014) (quoting *Connick v. Thompson*, 563 U.S. 51, 62 (2011) (internal citations and quotation marks omitted)). However, "[a] plaintiff also might succeed in proving a failure-to-train claim without showing a pattern of constitutional violations where a violation of federal rights may be a highly predictable consequence of a failure to equip law enforcement officers with specific tools to handle recurring situations.'" *Long*, 442 F.3d at 1186 (quoting *Board of Cty. Comm'rs v. Brown*, 520 U.S. 397, 409 (1997)).

The Court concludes that CCSF has not met its burden to show that it is entitled to summary judgment on plaintiff's failure to train theory. Bell has raised triable issues of fact as to whether the failure to train deputized staff about S.O.R.T. cell extraction and safety cell placement of inmates with disabilities resulted in constitutional violations. Bell has also demonstrated questions of fact about whether his cell extraction and safety cell placement complied with the policies, raising questions about the adequacy of the training provided. Accordingly, the Court DENIES defendants' motion for summary judgment on this claim.

## C.    Act by Final Policymaker/Ratification

Plaintiff may establish municipal liability by showing that "on a given occasion the conduct was the result of 'a deliberate choice . . . made from among various alternatives by the official or officials responsible for establishing final policy with respect to the subject matter in question.'" *Fuller v. City of Oakland*, 47 F.3d 1522, 1534 (9th Cir. 1995), as amended (Apr. 24, 1995) (quoting *Pembaur v. City of Cincinnati*, 475 U.S. 469, 483-84 (1986). "A municipality also can be liable for

an isolated constitutional violation if the final policymaker 'ratified' a subordinate's actions." *Christie v. Iopa*, 176 F.3d 1231, 1238 (9th Cir. 1999) (citing *City of St. Louis v. Praprotnik*, 485 U.S. 112, 127 (1988)).

Plaintiff contends that Sergeant Williams had final policymaking authority from CCSF regarding the use of the S.O.R.T.  Plaintiff cites the S.O.R.T. policy, which authorizes a scene commander to assemble, plan and execute a S.O.R.T. cell extraction, and plaintiff has submitted evidence showing that on January 18, 2018, Sergeant Williams was the scene commander.  Plaintiff contends that Captain Fisher is a final policymaker because the S.O.R.T. policy provides that the facility commander approve S.O.R.T. decisions, and Fisher was the facility commander who approved Sergeant Williams' decision.[5]

Defendants argue that plaintiff's claim fails because Sergeant Williams and Captain Fisher are not final policymakers.  Defendants note that the S.O.R.T. policy was approved by a Chief Deputy, *see* Wang Decl., Ex. H (Dkt. No. 11-10), and they argue that under *Pembauer*, the facts that Sergeant Williams had discretion to order a S.O.R.T. and that Captain Fisher had discretion to approve a S.O.R.T. decision does not mean that they are final policymakers for purposes of municipal liability.

The Court agrees with defendants.  "Municipal liability attaches only where the decisionmaker possesses final authority to establish municipal policy with respect to the action ordered.  The fact that a particular official—even a policymaking official—has discretion in the exercise of particular functions does not, without more, give rise to municipal liability based on an exercise of that discretion."  *Pembaur*, 475 U.S. at 481-82; *see also id.* at 483 n.12 ("[I]f county employment policy was set by the Board of County Commissioners, only that body's decisions would provide a basis for liability.  This would be true even if the Board left the Sheriff discretion to hire and fire employees and the Sheriff exercised that discretion in an unconstitutional manner; the decision to act unlawfully would not be a decision of the Board.").  Here, Bell has shown that

---

[5]  The Court notes that plaintiff does not assert that either Williams or Fisher had been delegated final policymaking authority, and thus the Court does not *sua sponte* consider whether such a theory could be viable.

1    Williams and Fisher had discretion to order and approve the usage of a S.O.R.T. team, but Bell has

2    not shown that either defendant had final policymaking authority with regard to the S.O.R.T. policy.

3          Accordingly, the Court GRANTS summary judgment in favor of defendants on this theory

4    of *Monell* liability.

5

6    **V.     ADA/Rehabilitation Act (Fourth and Fifth Causes of Action)**

7          As an initial matter, the parties disagree about whether the ADA and Rehabilitation Act

8    causes of action are limited to challenging the manner in which Bell was transported by the S.O.R.T.

9    team – namely, without a wheelchair or other assistive device and being required to hop on one leg

10   and then carried – or whether these causes of action also embrace Bell's claim about being denied

11   toileting assistance when he was placed in a safety cell that lacked a raised toilet.  Defendants

12   contend that Bell has raised the toileting claim for the first time on summary judgment, while Bell

13   contends that his fourth and fifth amended complaints presented his claim about toileting.

14         The Court agrees with plaintiff that the fourth and fifth amended complaints alleged that Bell

15   was placed in a safety cell that lacked a toilet, that detainees are forced to defecate and urinate into

16   a grate on the ground, and that Bell "was not provided with any disability appliance such as a toilet

17   aid during his confinement in the safety cell."  Fifth Amend. Compl. ¶¶ 28, 31 (Dkt. No. 72).  Those

18   allegations were incorporated into the ADA and Rehabilitation Act causes of action.  *Id.* at ¶¶ 51,

19   55; *see also* Fourth Amend. Compl. ¶¶ 25, 28, 49, 53.  This issue was also explored at Bell's

20   deposition.  As such, defendants have been put on notice of Bell's toileting claim.  *See Updike v.*

21   *Multnomah Cty.*, 870 F.3d 939, 953 (9th Cir. 2017) (holding factual allegations of failure to provide

22   auxiliary aids and services coupled with the plaintiff's deposition testimony regarding the same put

23   defendant county "on notice of the evidence it would need to defend against Updike's ADA and

24   Rehabilitation Act claims").

25         "Under both Title II of the ADA and § 504 of the Rehabilitation Act, [a plaintiff] must show

26   that he was excluded from participating in or denied the benefits of a program's services or otherwise

27

28

United States District Court
Northern District of California

discriminated against." *Updike*, 870 F.3d at 950.[6] "A public entity may be liable for damages under Title II of the ADA or § 504 of the Rehabilitation Act 'if it intentionally or with deliberate indifference fails to provide meaningful access or reasonable accommodation to disabled persons.'" *Updike*, 870 F.3d at 950 (quoting *Mark H. v. Lemahieu*, 513 F.3d 922, 937–38 (9th Cir. 2008)). "When the plaintiff has alerted the public entity to his need for accommodation (or where the need for accommodation is obvious, or required by statute or regulation), the public entity is on notice that an accommodation is required, and the plaintiff has satisfied the first element of the deliberate indifference test." *Duvall*, 260 F.3d at 1139. To meet the second prong, the entity's failure to act "must be a result of conduct that is more than negligent, and involves an element of deliberateness." *Id*. The "failure to provide reasonable accommodation can constitute discrimination." *Vinson v. Thomas*, 288 F.3d 1145, 1154 (9th Cir. 2002).

The Court concludes that there are triable issues of fact on the ADA and Rehabilitation Act claims. There is no dispute that plaintiff is disabled or that defendants were aware of plaintiff's disability and that he had been medically cleared to use a wheelchair and a prosthetic device. The parties dispute whether, under the circumstances of the S.O.R.T. extraction and safety cell placement, deputies were required to transport Bell using a wheelchair or other assistive device and whether plaintiff should have been provided with a prosthetic or assistance to toilet (or placed in a different safety cell that had a raised toilet). Plaintiff emphasizes that the S.O.R.T. team had over 40 minutes to prepare his extraction and safety cell placement, and thus that there was ample time to secure a wheelchair and other accommodations. Plaintiff also notes that the extraction took place in C-Pod, the medical pod, and he states that there are wheelchairs and other assistive devices readily available. Defendants argue that the exigencies of the situation, including security concerns, required that Bell be transported as he was and placed in the safety cell in C-Pod. These questions cannot be resolved on summary judgment, and accordingly the Court DENIES the parties' cross-motions on these claims.

---

[6] The Rehabilitation Act only applies to recipients of federal funding, and there is no dispute that this element is met here.

## CONCLUSION

For the foregoing reasons, defendants' motion for summary judgment is GRANTED IN PART AND DENIED IN PART, and plaintiff's motion for partial summary judgment is DENIED.

**IT IS SO ORDERED**.

Dated: November 21, 2021                    _____

                                            SUSAN ILLSTON
                                            United States District Judge

United States District Court
Northern District of California